THE PRESIDENT, DIRECTORS AND COMPANY OF THE
DELAWARE AND MARYLAND RAIL ROAD COMPANY *vs.*
JOHN STUMP.—*June,* 1837.

The grant of a several fishery, in a public navigable river, cannot be pre-
sumed from the mere uninterrupted use and enjoyment of the right of
fishing for more than twenty years.

If such presumption can be made at all, from the fact of such use and
enjoyment, it must be shown to have been in exclusion of the right of
others, and the absence of an averment to that effect, in a bill praying for
an injunction to protect such right, was held to be fatal to the com-
plainants' case.

Though the grant of a right to erect wharves, and employ steamboats, if
destructive of the paramount right of general navigation and fishing, may
be void; the remedy is not by injunction, which is only applicable to
special injuries in violation of private rights. Public grievances are not to
be redressed by individuals at their own suit.

Appeal from Chancery, from an order granting an injunc-
tion, and an order refusing to dissolve it on motion, under
the act of 1835, *ch.* 340.

On the 13th September, 1836, *John Stump,* of *Cecil* county,
by his bill complained, that his father was seized and pos-
sessed in fee, under a patent of the state, of a valuable tract
of land at the mouth of the *Susquehanna river,* and established
upwards of twenty years, certain fisheries thereon, and at
which large quantities of shad and herring were annually
taken by seines hauled over certain portions of said river;
that complainant is the devisee of said tract, and in posses-
sion of all its rights and privileges, and has used and enjoyed
the same, that on the 2d March, 1811, *John Stump,* the
father, leased to one *Martha Coffield,* for the term of ninety-
nine years, with covenants for renewal, eight acres of said
estate, binding on the public road leading from the said
river to *Charlestown,* and along the said river, according to a
plat exhibited with the bill; that immediately below this
leasehold, one of the fisheries of the complainant is situate,
the haul of the seine from which, extends along and above
the shore of the said lot, and over to the bar, making into
said river from *Watson's Island;* that owing to the rapidity

and strength of the current of said river, a seine cannot be laid out and hauled from said fishery, in any other direction, than the one indicated on the plat by dotted lines, and that complainant and those under whom he claims, have so used, possessed, and enjoyed the said haul without interruption, and been always accustomed so to lay out their seines for upwards of twenty years; that the said rail road company have recently professed to have purchased the said leasehold estate of *Coffield,* and have located the line of their road over the same, and have laid out, and are now erecting a wharf from the shore, where the line of their said road terminates, into the *Susquehanna river* which said contemplated wharf, is designated on said plat; that the river is 240 perches wide at the point where the said wharf is to be erected, that it is 94 perches from the *Cecil* shore at said point, to the opposite *shoal* or bar, formed in said river from the lower end of *Watson's Island;* that the said wharf extends 49 perches *into said river,* being more than one-fifth of the whole width of said river, and exceeding half its width from the *Cecil* shore, to the bar formed from the lower end of *Watson's Island;* that the said wharf will encroach about 250 feet on the channel of said river, which flows between *Watson's Island* and the *Cecil* shore, and extends that distance further, than is necessary to admit of the safe and easy approach of any vessel navigating said river, or which said rail road company can desire to employ for the purpose of crossing the said river, if they have any authority to establish a ferry at said river, or to place any fixture below the high-water mark in said river, which the complainant denies, and he shows that said wharf when constructed, will be an encroachment on the rights of navigation, and an injury thereto, which said company have no authority to interfere with.

And the said bill further alleged, that prior to the act of 1835, *ch.* 168, persons owning lands on the margin of the navigable waters of this state, had no lawful authority to erect wharves, so as to encroach on the streams below high-water mark, and that the said statute has conferred the right

on the proprietors of fee simple estates, with an express saving in favour of the rights and interests of navigation and fishing; that the company have no assignment from *Coffield*, and are not the proprietors of the fee, from which they are constructing said wharf, but that the same is vested wholly in complainant; that said wharf will extend across about one-half the haul of his seine from his fishery, and render it impracticable to fish the same as heretofore, and that it will wholly destroy his fishery, which is worth fifteen thousand dollars; that he owns other valuable fisheries a small distance below the one before mentioned, and has owned them for upwards of twenty years, which the erection of said wharf will tend to injure; that such obstructions create deposites of sediment and mud, and tend naturally to fill up the shore, make flats of mud and destroy fisheries.

The bill further charged, that the company had no authority to ply a ferry boat across the river, and that the wharf under construction was in fact a bridge, extending more than half the distance across the eastern branch of the river, is not necessary nor indispensable for any legitimate purpose within the charter powers of said company, and is a device to narrow a passage across the river without authority, to the injury of your orator and the public; that any great destruction of the paramount interest of general navigation and fishing is void; and the bill then claimed damages for the injury about to be inflicted on complainant's rights. Prayer for an injunction against the company, to forbear from making, constructing, or completing the said wharf as laid out from *Coffield's* lot, or from using it, or placing obstructions in the river, and for a summons for the company, and *subpœna* for the president and directors thereof, and for general relief.

The complainant filed a plat, and a proven statement of a surveyor, verifying its courses and distances.

On the 13th September, 1836, the chancellor (*Bland*) granted the injunction, with liberty to the defendants after filing their answers, to move for a dissolution on ten days' notice to the plaintiff or his solicitor.

The answer of the rail road company averred its incorporation by the legislature of *Maryland*, to construct a rail road from the dividing line between the states of *Delaware* and *Maryland*, to some point on the *Susquehanna river*, and to erect all needful buildings, wharves, warehouses, and other edifices requisite for the business of the said company, and also to establish a line of steamboats between the cities of *Baltimore* and *Philadelphia*, in connection with said rail road, and referred to the act of 1831, *ch.* 296, and its supplements. The answer admitted the construction of the wharf, at the place designated in the bill, but denied that it was unnecessarily extended into the river. It admitted that the company had not the title to *Coffield's* lease, but had made arrangements to procure it, and also admitted, that complainant was owner of the fisheries as charged, but insisted, they were so far below the wharf and ferry, that any injury to them from navigating the river was imaginary. All consequential injuries from deposites of sediment, &c. were also denied; that the complainant's fishing right was to be enjoyed contiguous only to his possessions, which the wharf did not interfere with, and his common right of fishing did not authorize this proceeding. The company admitted their design to use a steamboat in connection with the rail road, and the wharf erected for that purpose, but denied its extension to be greater than requisite to procure the necessary depth of water for a steamboat of the proper construction. The defendants denied that the wharf would injure the navigation of the river, and insisted, that if the spawn of the fish should be destroyed by the steamboat, it was an injury for which the complainant had no redress; that the steamboat and wharf were such, as according to the judgment of skilful engineers, were necessary for the convenient and free use of said rail road; that for any injury resulting from the navigation of the river the complainant cannot claim damages; that the habit of laying out seines in oblique directions from the shore, confers no several right of fishery, and that in public navigable rivers, the right of navigation, is paramount to that of fishery.

After the filing of the answer, the company by petition prayed for the hearing of a motion, to dissolve the injunction at an early day, but the chancellor being of opinion that his original order had sufficiently provided for that motion, dismissed the petition with costs.

Afterwards it was agreed, that the motion should be heard on the 14th October, 1836; and the complainant then filed various exceptions to the answer, insisting that the injunction should not be dissolved, nor until the president and certain directors of the company under *subpœna* by the bill, had also answered with the company.

On the 14th October, the chancellor continued the injunction until final hearing, or further order—and directed that the exceptions should stand for hearing, on the 15th November: Whereupon, the rail road company brought this appeal.

The cause was argued before BUCHANAN, Ch. J. and STEPHEN, ARCHER, DORSEY, CHAMBERS, and SPENCE, Judges.

OTHO SCOTT, for the appellant.

The complainant claims:

1. For an injury to a public river, an obstruction to the right of navigation.

2. For an injury to his private fishery.

1. Can the complainant obtain an injunction against a general nuisance. This is only remedied by a public prosecution, as an infraction of a public right Injury to navigation is not a ground for an injunction.

I shall consider the case on the ground of injury to private rights.

The act of 1834, *ch.* 281, *sec.* 4, confers on the company power to erect wharves. It confers all powers needful and requisite for the company. The power to connect the rail road and steamboat lines, incidentally confers the power of constructing a wharf. They must be brought to some point of contact. They must unite. This is apart from the ex-

press power, so far as the right of navigation is concerned, the legislature has granted it, and it is valid, unless their power is denied. A wharf is generally established to facilitate navigation. If defendants are authorized to construct it, it is no ground of complaint, that they have done so. The legislature has a right to control the public right of navigation. This is done in so many cases of canal and rail road companies, that practically the right is not disputed. Such an act is valid in the legislature. *Hooker vs. Cummings,* 20 *John.* 90. The legislature may delegate this power, and no injunction is obtainable for obstructions to navigation in a case like the present.

The only other question raised by the bill is, has the complainant set forth a several right of fishery, or can it be claimed in the public waters.

At common law, there was, and is, a common right to fish in public rivers. How did the complainant get the right to fish? No such right is acquired, unless from the legislature. The grant of soil adjacent to public waters, does not grant a several right of fishery. This right must be expressly granted. *Warren vs. Matthews,* 6 *Mod.* 73. *Hamer vs. Raymond,* 1 *Serg. and Low.* 266. The right here is claimed, upon what might be evidence of a right of several fishery. But the complainant should have stated his several right as acquired, and in the legitimate mode. The mere claim does not confer it. No right springs from twenty years use of a public navigable river. It is not like the use of a private way, where the right is presumed in lieu of an invasion of the private right. The idea is, that user is sufficient to deprive one of a public right. But in this case, the user encroaches upon no one, there was originally no violation of law. The party was only pursuing a common right. *Chalker et al vs. Dickinson et al,* 1 *Con. Rep.* 382. *Vooght vs. Winch,* 2 *Bar. and Ald.* 662. The complainant then shows no several right of fishery.

Has the legislature then a right to erect a wharf, which interferes with a common right of fishery.

The right of navigation is paramount to the right of fishery, which gives the right of making wharves. The paramount right gives the power to sustain it by various improvements. *App. to Angel,* 110, 94. *Harmond vs. Pearson,* 1 *Camp.* 517. The right of fishing is subordinate to the right of navigation. The object of the law is to facilitate navigation, to navigate with steamboat, the modern improvement is no legal interference with the right of fishing; as to piscarian rights assuredly twenty years user, is evidence of a grant. Then would the conversion of all such rights of the state into several rights, vary the rights of navigation? These would still remain. The soil of navigable water covered by it, may be granted, but the right of navigation still remains, as also that of fishing. *Browne et al, Lessee vs. Kennedy,* 5 *Har. and John.* 196. All private rights of soil and fishery, are subordinate to the rights of navigation. Buoys may be erected within the lines of a several fishery covered by navigable waters. The private right in this case is not a perfect but a modified right, liable to modifications; obstructions may be removed to improve navigation. Channels may be deepened and varied and fishing apparatus destroyed. In some cases unnavigable rivers are controlled, and navigation improved, by interference with private rights. The character of our American rivers, where there is no tide, no flux or reflux, which according to the common law would make the *Ohio* a private river, is affected by these principles, and the rights, in these waters are subject to modification.

The answer denies the right of a several fishery, and the plat shows how the right claimed has been exercised. If a right of several fishery is appurtenant to the shore, it is limited by the extent of the proprietor's possessions. The right claimed here exceeds the shore. It is in front of the shore of another, and not from a right line to the middle of the river, but on a diverging line covering double his extent of shore.

The abuse of the channel is denied, and as the channel has to be passed by the steamboat of the company, there is

no inducement to extend the wharf beyond the necessary distance.

A grant binding on a public river does not confer any right of soil below low water mark, on private rivers the right extends to the middle of the stream. The soil covered by navigable waters was in the king : the complainant's tract is said to be bounded by the *Susquehanna river*.

If the answer on this motion is taken to be true, it is a negation of every fact on which the complainant could claim an injunction. The right to fish, the unlawfulness of the wharf, and its unnecessary extent, are all denied.

An exception has been taken to the answer that it is not sworn to : the seal of the corporation is as effectual as the oath of other defendants : if not so it is out of the power of a corporation to put in an effective answer to an injunction bill, for where matters are not within the private knowledge of the officers of a corporation they are not properly parties. *Haight vs. Proprietors of the Morris Aqueduct*, 4 *Wash. C. C. Rep.* 600. *Angel on water courses*, 99, 211. *Weld vs. Hornby*, 7 *East.* 195.

H. STUMP, and A. CONSTABLE, for the appellee.

The counsel for the appellee propose to examine the order granting the injunction, and the order overruling the motion to dissolve it, in conjunction, under the impression that the case as presented by the record, shows that both orders rest upon the same facts : and in support of this view they will contend :

1st. That no answer has been filed which the court can regard, upon the motion to dissolve ; and

2d. That if the answer of the corporation is considered, it does not contain a sufficient denial of the allegations upon which the injunction was awarded to entitle the defendants to a dissolution.

This bill was exhibited against the *Wilmington and Susquehanna Rail Road Company, James Canby*, its president, and *Matthew Newkirk*, and *David Wilson*, the only two of

its directors known to the complainant—process is prayed against them, and *Canby, Newkirk,* and *Wilson* are required to answer upon oath. The only answer filed is by the corporation and that under their common seal merely.

The object of the complainant was to obtain a discovery under oath, as to the truth of the allegations contained in his bill, and with that view he made *Canby, Newkirk* and *Wilson,* defendants. There was no other mode by which he could compel such a disclosure, the corporation having the right to answer under their common seal. An officer or agent of a corporation, who is made a party to a bill seeking a discovery in regard to the acts of the corporation of which they are officers or agents, is bound to file a sufficient answer under oath. *Wych vs. Meal,* 3 *Peere Wms.* 310. *Dumner vs. Corporation of Chippenham,* 14 *Vesey,* 245, *and* 1 *Page's Ch. Rep.* 100.

The complainant has taken every legal precaution then, by resorting to the only means that could entitle him to an answer under oath, and yet while such answers are purposely withheld, a dissolution of the injunction is sought upon the answer of the corporation alone, without other evidence of the verity of its contents than that which its official seal furnishes. Such an answer cannot be allowed any influence upon the decision of the motion to dissolve. It has no other effect than to put in issue the matters in controversy like the general issue plea at law, and does not upon final hearing require the evidence of two witnesses, or of one corroborated by pregnant circumstances, to rebut it. *Union Bank of Georgetown vs. Geary,* 5 *Peters' Rep.* 111.

The corporation asked a hearing of the motion on their answer alone, with full knowledge that the complainant sought a discovery through its agents under oath. The prayer of the bill for *subpœnas* to compel its officers to answer upon oath, evidenced the complainant's unwillingness to abide by statements, to which its corporate seal might be affixed. It was notice to the corporation that he required that his own oath should be supported, or rebutted, by the affirmation of

individuals who would act under proper moral and legal responsibility. What liability is incurred by the false response of a corporation? It is an intangible and artificial being, deriving its existence from legislative enactments, incapable of committing perjury, and as strongly expressed by chancellor *Kent*, "having neither soul to be saved nor body to be kicked."

The corporation then acted with full notice of what the complainant required, and being bound to know the legal character and effect of their own answer, if it is repudiated, the fault is their own.

What then is the effect of the answer of a corporation under its common seal, unsupported by either the oath or answer of any of its officers? This question is settled in the case of the *Fulton Bank vs. the New York and Sharon Canal Company and others*, 1 *Page's Chan. Rep.* 311, in which the president of the corporation had made oath to its seal, and the secretary, " who was not an officer of the company at the time of the transactions," that he believed the facts to be true. Yet chancellor *Walworth*, after remarking, that as corporations answered under their common seal without oath, they were at liberty to deny every thing contained in a bill whether true or false, expressly laid down, " but no dissolution of an injunction can be obtained upon the answer of a corporation, which is not duly verified by the oath of some officer of the corporation, or other person, who is acquainted with the facts contained therein." That there was " no hardship in the rule as applied to corporations, as it only put them in the same situation as other parties."

This rule is sustained by reason and analogy. The injunction is granted upon the complainant's statements verified by his oath; nothing short of the oath of a defendant can countervail them. They are regarded as true not merely until denied, but, until there is a denial accompanied by all the weight of moral and legal responsibility that attached to him who made them. No one will pretend that the seal of a corporation furnishes as strong *indicia* of truth as the oath of

a responsible individual. On the contrary, as chancellor *Walworth* justly observes, " they are at liberty to deny every thing contained in the bill whether true or false." To place then the bill of an individual regularly sworn to upon the same footing with the answer of a corporation under their common seal, would be virtually a denial of the efficacy of those moral and legal obligations under the weight of which every oath is taken. If therefore it were even admitted that the answer is strictly responsive to, and denies all the equity of the bill, it could not avail the defendants, because it wants the indispensable sanction of an oath

2d. Supposing it properly verified, and yet we contend that it cannot entitle the defendants to a dissolution of the injunction, and for the obvious reason that all its denials are from information and belief merely.

It is well settled, that an injunction will not be dissolved " unless the defendants positively deny all the equity of the bill. A denial from information and belief is not sufficient." *Ward vs. Van Bokkelen,* 1 *Page's Ch. Rep.* 100. *N. Rogers, et al vs. H. Rogers, et al, Ib.* 426. 5 *Peters' Rep.* 111. 2 *Gill and John.* 208, and the case of the *Fulton Bank vs. the New York Canal Company, et al,* before cited, in which the chancellor says, " the officer of the institution, who was such at the time referred to in the complainant's bill, has studiously avoided saying any thing as to the truth of the answer, leaving it to the secretary, who knows nothing of its truth or falsehood, to express his belief on the subject." In this case too the secretary made oath to his belief of the truth of the answer, while here there is no affidavit by any one, not even as to the seal of the corporation. The sentence we have quoted appositely describes the conduct of the president of this corporation. He will neither answer for himself, nor verify the answer of the company. We insist therefore that upon both grounds the answer of the corporation must be disregarded.

But if the answer is respected and its statements accorded the weight of positive denials, we should still contend that

there is sufficient matter in the bill, that the corporation has either not denied, or omitted and refused responding to, and which on the question of dissolution is to be taken as true. *Young vs. Grundy*, 6 *Cranch's Rep.* 51, for granting and continuing the injunction.

We cannot, however, doubt that under the circumstances of this case, the court will decline entering into any analysis of the answer with a view to discover its admissions or omissions, but will look solely to the bill, which is uncontradicted upon oath, as furnishing the only evidence of truth by which to direct their inquiries.

Did the complainant then present in his bill an appropriate case for the interposition of the court of Chancery by injunction ? What are the facts upon which he sought relief?

The bill alleges that the complainant's father being seized in fee under a patent from the state, of a valuable tract of land bounded on the *Susquehanna river*, established upwards of twenty years since, by clearing out the bed of the river at a considerable expense, certain fisheries on said property, at which by means of seines hauled over certain portions of said river, large quantities of shad and herring were annually taken.

That at his death he devised said estate with all and singular its rights and advantages of fishery to the complainant, under which devise the complainant entered into possession and has always since then quietly and without any kind of interruption, held, used and enjoyed the same, together with its rights and advantages of fishery, as laid down in a plat made out and sworn to by the surveyor of *Cecil* county, and exhibited with his bill, shewing the river, fishing shores, the haul of one of his seines, and the wharf, which the rail road company are constructing.

That in the year eighteen hundred and eleven, the testator leased to one *Martha Coffield*, for the term of ninety-nine years, at an annual rent, with covenants for renewal and for re-entry or non-payment of the rent, about eight acres of said estate. That immediately below said lot one of the said

fisheries was established, and the haul of the seine from which extends along and above the shore of said lot and over to the bar making into the river from *Watson's Island,* as particularly shown upon the plat: and that owing to the rapidity and strength of the current of the river, a seine cannot be laid out and hauled from said fishery in any other direction than that designated on said plat; and that the complainant and those under whom he claims, have so used, possessed and enjoyed said haul, without interruption, and been always accustomed so to lay out their seines, for upwards of twenty years.

That the *Susquehanna and Wilmington Rail Road Company,* a private corporation, created by a statute of Maryland, have located the track of their road over the said lot, leased to *Coffield,* and are erecting a wharf from the shore, where the line of said road terminates.

That the *Susquehanna river* is two hundred and forty-three perches wide at the point where said wharf is to be erected, and that it is ninety-four perches from the *Cecil* shore, at said point, to the opposite shoal or bar formed in said river, from the lower end of *Watson's Island;* that said wharf extends forty-nine perches from the shore, being more than one-fifth of the width of the river, and exceeding half its width from the *Cecil* margin to the bar making from the lower end of *Watson's Island:* that it will encroach about two hundred and fifty feet upon the channel of the river flowing between *Watson's Island* and the *Cecil* shore, and extend that distance further than is necessary to admit of the safe and easy approach of any vessel navigating the said river, or which said rail road company can desire to employ for the purpose of crossing said river, if they have any authority to establish a ferry, or place any fixture below high-water mark, in said river, and that the construction of said wharf will be an injury to the navigation wholly unauthorized by their charter.

That said wharf will extend across about one-half of the haul of complainant's seine from his aforesaid fishery, render it impracticable to fish it as heretofore, and entirely destroy

the fishery. That the said haul, appurtenant to said fishery, as aforesaid possessed, used and enjoyed, for upwards of twenty years, is a valuable right, defined and protected by law, and which the said rail road company have no authority to impair or injure, and that his said fishery, which the erection of said wharf will utterly destroy and ruin, is worth fifteen thousand dollars.

The bill further alleges that the complainant owns several other valuable fisheries, situate on said river, a short distance below the before mentioned fishery, which, with the hauls respectively attached to them, have been possessed, used and enjoyed by him, and those under whom he claims, for upwards of twenty years, and that the erection of said wharf will tend greatly to injure, if not entirely destroy them; that the great quantity of mud and other deposite which will lodge and accumulate about said wharf, and gradually spread itself and settle for a considerable distance along the shore, will fill up and ultimately render the whole shore now owned and used for fishing by complainant, a flat of alluvial deposite, unfit for fishing, and valueless.

That the water which covers the haul of his several fisheries has been from time to time, by the proprietors thereof, cleared of obstructions at great cost and expense, in order to improve the fisheries; that his said last mentioned fisheries, and shore adapted to fishery, is worth *sixty thousand dollars*, and that if the same is not entirely destroyed it will be very much injured and depreciated in value by the erection of said wharf.

The bill further alleges that the said wharf is not necessary or indispensable for any legitimate purpose within the charter powers of said company, but is a device and invention of its agents to narrow the passage across said river, without authority, and to the great injury of complainant and the public; and that if any authority to erect a wharf has been conferred on said rail road company, which is denied, it was never intended that they should exercise it so as to interfere with the paramount interests and rights of navigation or fishery.

We have made these extracts from the bill in order that the court might have a condensed statement of the prominent facts on which the orders of the chancellor, from which this appeal is taken, were based.

1. The appellee claims to be entitled as *riparian* proprietor to a moiety of the bed of the *Susquehanna river* in front of his estate, and to a several right of fishery over the same

The wharf which the rail road company is constructing projects into the river within these limits; and if the appellee's pretensions are well founded, clearly encroaches on his property.

It will no doubt be contended on the part of the appellants, that according to the rule which has prevailed in *England*, the *riparian* proprietor is not entitled to the soil or several fishery *filum aquæ* of *navigable* rivers, and that, as the *Susquehanna*, where it bounds the estate of the appellee, is a navigable river, meaning technically a river in which the tide ebbs and flows, he is subject to the operation of that rule.

What then is the *English* rule, and how far does it apply to this case?

It seems always to have been well settled in *England* that every *riparian* proprietor was entitled *prima facie* to the soil and right of fishery, *ad filum medium aquæ*, in all private and public rivers, in the *former* absolutely, and in the *latter* subject to the easement of navigation.

*Hale*, in his treatise *De Jure Maris, ch.* 1, *Harg. Law Tracts*, 5, says, "Fresh rivers of what kind soever, do of common right belong to the owners of the soil adjacent; so that the owners of the one side, have of common right, the propriety of the soil, and consequently the right of fishing, *usque filum aquæ*; and the owners of the other side the right of soil or ownership and fishing unto the *filum aquæ* on their side. And if a man be owner of the land of both sides, in common presumption he is owner of the whole river, and hath the right of fishing according to the extent of his land in length. With this agrees the common experience."

*Ch.* 3, *page* 8—" There be some streams or rivers, that are private not only in propriety or ownership, but also in use, as little streams and rivers that are not a common passage for the king's people.   Again, there be other rivers, as well fresh as salt, that are of common or public use, for carriage of boats and lighters.   And these, whether they are fresh or salt, whether they flow and reflow or not, are *prima facie publici juris*, common highways for man or goods or both from one inland town to another.   Thus the rivers of *Wey*, of *Severn*, of *Thames*, and divers others, as well above the bridges and ports as below, as well above the flowings of the sea as below, and as well where they are become to be of private propriety as in what parts they are of the king's propriety, are public rivers, *juris publici.*   And therefore all nuisances and impediments of passages of boats and vessels, though in the private soil of any person, may be punished by indictments and removed."

The author must not be understood as meaning that the soil of public rivers is " *prima facie publici juris*," but only that the public are entitled to the use of the stream for the purposes of navigation and commerce, as is shewn by the following quotation from *ch.* 2, *p.* 8, in which he treats of the " *rights of prerogative*" over such rivers.   " These public rivers for public passage are called *fluvii regales ;* not in reference to the propriety of the river, but to the public use.   And therefore the report in *Sir John Davyes* of the piscary of *Ban* mistakes the reason of these books, that call these *streames le roy*, as if they were so called in respect of propriety, for they are called so because they are of public use, and under the *king's* special care and protection, whether the soil be his or not."

But the property in the soil of all arms of the sea and rivers in which the tides flowed was *prima facie* in the *king*. *Hale's De Jure Maris*, *ch.* 4, *pp.* 10, 11, 17 ; *ch.* 5, *pp.* 19, 20, and opinions of *Hale*, *Ch. Jus.* in the case of *Lord Fitzwalter*, 1 *Mod.* 106 ; *Holt*, *Ch. Jus.* in *The King vs. Wharton, et al*, 12 *Mod.* 510 ; *Lord Mansfield* in *Carter, et al vs.*

*Murcot, et al,* 4 *Burr.* 2164, and of *Buller Jus.* in *Rex vs. Smith, Doug.* 446.

The rule then is well established in *England,* that the right of property in the soil of navigable rivers is *prima facie* vested in the crown, and in that of private rivers, in the *riparian* proprietors, *usque filum aquæ.*

These principles, as well as the reasons on which they were established, have been recognized and adopted in this country in the following cases. In *Palmer vs. Milligan,* 3 *Caines,* 319, *Kent, Ch. J.* applied the doctrine to the owners of the banks of the *Hudson river* as low down as *Stillwater.* So as to the river *Saranac* in the case of *The People vs. Plate,* 17 *John. Rep.* 197, and as to the *Salmon river* in *Hooper vs. Cummings,* 20 *John. Rep.* 90. The same general rules are adhered to in *ex parte Jennings,* 6 *Cowen,* 518, and *per chancellor Walworth* and *senator Allen,* in the case of *The Canal Commissioners vs. The People on the relation of Tibbits,* 5 *Wendall,* 423. In the cases of *Adams vs. Pease,* 2 *Con. Rep.* 481, and of the *Commonwealth vs. Chapin,* 5 *Pick. Rep.* 199, they are applied to the *Connecticut river*— in *Clarmont vs. Carlton,* 2 *New Hamp. Rep.* 370, to the *Sugar river*—in *Hayes, Ex'rs vs. Bowman,* 1 *Ran. Rep.* 418, to *South river,* and in *Gavit vs. Chambers, et al,* 3 *Ham. Rep.* 495, to the *Sandusky river.* They are adopted by judge *Story* in the case of *Taylor, et al vs. Wilkinson, et al,* 4 *Mason's Rep.* 400, in respect to the *Pawtucket river,* and adhered to by him, in *Farum vs. Blackstone Canal Corporation,* 1 *Sum. Rep.* 52. In the cases decided as to the rivers *Hudson, Connecticut* and *Sandusky,* the doctrine was applied to portions of those rivers that were navigable and used as public highways; and the opposite views asserted by a majority of the court in *Carson vs. Blazer,* 2 *Bin. Rep.* 476, are controverted in both *Hooker vs. Cummings,* and the *Commonwealth vs. Chapin.*

But in some of the states the *riparian* right has been deemed, as we think it should in *Maryland,* to apply equally to rivers in which the tides flowed and reflowed. In *New*

*Jersey* the grantees of lands bounding on the *Delaware*, *Rariton*, and other navigable rivers, as well as those adjacent to public rivers, own the soil to the centre of the stream. *Angell on Tide Waters*, 44.

2. The appellee claims a right of property in the bed of the river, *filum aquæ*, under a grant, which may be presumed from his long and uninterrupted possession.

Such a right in a navigable river might be granted in *England* by the *king*, and here by the *State*. Has then the appellee's possession been of sufficient duration to afford the presumption of a grant?

It is well settled, both in *England* and in this country, that an uninterrupted possession for twenty years, is a sufficient foundation for the presumption of a grant. 6 *East*. 215. *Gray vs. Bond*, 2 *Brod. and Bing*. 667. 4 *Wash. C. C. Rep*. 608, and in the case of *Palmer vs. Hicks*, 6 *John. Rep*. 137, it is conceded that evidence of long exclusive possession and use, will warrant the presumption of a grant of lands under navigable waters, to the owner of the adjacent soil. No distinction is taken in this case in regard to the presumption, as against a title set up by a citizen, and that preferred by the *State*, though the court seem to allude to a claim by the commonwealth. But in *Maryland*, by the act of 1818, *ch*. 90, such a possession is made, *per se*, a complete bar, not only as against an individual, but to any claim asserted on the part of the *state ;* the act is, in terms, an unconditional surrender on the part of the state, in favour of any party who has held twenty years undisturbed possession. But if the right of entry by the state is not expressly barred in the present case, still this statute is applicable by analogy, and in that view furnishes evidence of the length of possession, which should authorize the presumption of a grant. " In general the supposition of a grant is limited to periods analogous to those of the statute of limitations in cases where the statute does not apply.". *Ricaud vs. Williams*, 7 *Wheat. Rep*. 59.

If then the appellee has acquired a title to the bed of the

river in any of the modes we have suggested, he is *prima facie* entitled to a several fishery in the same.

The next inquiry is, as to whether these rights were transferred to *Coffield*, so far as the demised premises bind along the river?

Conceding that the lease *prima facie* vested in the lessee the property in the soil to the middle of the river, yet we apprehend, it is competent for the appellee to rebut this presumption of title. There is nothing in the record shewing, that the soil covered by the river, and embraced within the haul of one of the appellee's fisheries, is expressly mentioned as parcel of the demised premises, but on the contrary, as the lot is located on the plat, it only extends to the shore. If it passed then it must have been by implication and presumption, which may be explained or contradicted by circumstances, showing that the lessor and the appellee have continually exercised acts of ownership over it. *Doe vs. Burt*, 1 *Term Rep.* 704, and *Keenlake vs. White*, 2 *Stark. Rep.* 508.

The evidence furnished by the averments of the bill, is, that they had annually removed obstructions, and held, used, and enjoyed the premises as appurtenant to their fishery, and without any kind of interruption. Are not such acts of ownership then for the period of twenty years, over the place in controversy, sufficient to repel the presumption of its being part of the demised premises? We think they should be so regarded.

But admitting that the right of property in the soil of the river, passed to *Coffield* as a part of the demised premises, and still we contend, that the circumstances stated in the bill, lay a proper foundation for the presumption, that a several right of fishery was reserved.

The soil of a river may be granted and a several right of fishery reserved. Such a reservation might be by *parole*, 6 *John. Rep.* 5; though a sufficient time has elapsed in this case to presume it was by deed. If then the continuous use and enjoyment of a several right of fishery in the water

opposite the demised lot, by the lessor and the appellee, for the whole period since the date of the lease, being now upwards of twenty-five years, be regarded as rightful, and which it must in the absence of any allegation to the contrary, it must be presumed to have been reserved by the lessor. Such a presumption is supported by other facts in the case. The fishery was established at the time the lease was made. The rent reserved was but one hundred dollars, and the fishery is stated to be worth fifteen thousand dollars, but utterly valueless without the haul extending out into the river along and opposite the shore of the property leased. Can it then for a moment be supposed that the lessor made any demise which destroyed such a valuable property, and that upon the nominal consideration reserved as rent? We must therefore presume a reservation of the right of fishery, and if so, neither *Coffield* nor any party claiming under her, can be permitted to destroy such right.

Suppose that no such reservation was made and that the lessee became invested with both the right of property in the soil and the right of fishery; then we should contend, that the twenty years' possession and enjoyment by the lessor and the appellee, warranted the inference, either of an abandonment, or a surrender of the fishery by the lessee. Such a period is sufficient to gratify the requisitions of the statute of frauds by affording the presumption of a surrender in writing and by deed.

4. The appellee claims a several right of fishery, in that part of the *Susquehanna river* where the rail road company are constructing their wharf, by usage, prescription, and an uninterrupted and exclusive enjoyment for more than twenty years.

The averments of the bill are, that the fishery, which the wharf will entirely ruin and destroy, had been established and kept in order for upwards of twenty years, at a considerable annual expenditure, incurred by the removal of obstructions out of the bed and water of the haul; and over which, during the whole of that period, they had been accustomed

at the fishing season to lay out and haul their seine, in the manner described on the plat, without objection or interruption.

Do these facts then establish a several right of fishery, as claimed by the appellee?

1. It is well settled in *England* that a several right of fishery in navigable rivers may be acquired either by grant, usage, or prescription. *Hale*, in his *De Jure Maris*, *ch.* 5, *p.* 18, after speaking of a subject's right to a several fishery in the sea, if by the king's charter or grant, and which are without question, says, "The second right is that which is acquired or aquirable to a subject by custom or prescription; and I think it very clear, that the subject may by custom and usage, or prescription, have the true propriety and interest of many of these several maritime interests, which we have before stated to be *prima facie* belonging to the king. A subject may by prescription have the interest of fishery in an arm of the sea, or in a creek or port of the sea, or in a certain precinct or extent lying within the sea; and these not only free fishing but several fishing." And *p.* 19, "though *prima facie*, an arm of the sea be in point of propriety the king's, and *prima facie* it is common for every subject to fish there, yet a subject may have by usage a several fishing there, exclusive of that common liberty which otherwise of common right belongs to all the king's subjects." In the case of the *Mayor* and *Commonalty* of *Oxford vs. Richardson*, 4 *Term. Rep.* 439, *Lord Kenyon* says, "with regard to the question of law in this case, as to the right claimed by the plaintiffs, there can be no doubt but that there may be a prescriptive right in a subject to a several fishery in an arm of the sea;" and *Buller, Jus.* observes, "one party is to prove that this is an arm of the sea, in which *prima facie* every subject has a right to fish; the other is to establish a prescriptive right, which destroys the general right." *Ib.* 440.

It is equally clear that the right of several fishery may be established in the same manner in this country. *Jacobson vs.*

*Fountain, et al,* 2 *John. Rep.* 170. *Gold vs. James,* 6 *Cowen* 369. *Rogers vs. Jones,* 1 *Wendall,* 237, and *Brown vs. Kennedy,* 5 *Har. and John.* 206. The only case which questions this right, is that of *Warren vs. Mathews,* in 1 *Salk.* 357 and *S. C.* 6 *Mod.* 73, but that case is supposed to have been misreported, as none of the authorities cited in either report sustain it, but some of them directly the opposite, and it was so ruled in *Rogers vs. Jones,* by the supreme court of *New York.*

2. This right does not depend on a *riparian* ownership, but may be vested in a person who neither owns, nor has any interest in the banks or soil of the river in which it is exercised and enjoyed. " Fishery may be of two kinds, ordinarily, viz: the fishing with the net, which may be either as a liberty without the soil, or as a liberty arising by reason of, and in concomitance with the soil, or interest or propriety of it." *De Jure Maris,* 18. It is true that at one time some doubts seem to have been entertained in *England,* as to whether a several right of fishery could exist independently of an interest in the soil or adjacent banks of the river. But in *Coke Litt.* 122, *letter m,* it is laid down, that " a man may prescribe to have *separatum piscariam* in such a water, and the owner of the soil shall not fish there." In the annotations of *Hargrave, note* 7, he says, " according to this passage, ownership of the soil is not necessarily included in a several fishery;" again, " nor do we understand why a several piscary should not exist without the soil, as well as a several pasture;" and after collecting and reviewing the authorities in support of the opposite doctrine, he concludes, " hence, as it should seem, the arguments are short of the purpose; for at the utmost they only prove, that a several piscary is presumed to comprehend the soil, till the contrary appears, which is perfectly consistent with *Lord Coke's* position, that they may be in different persons, and indeed appears to us to be the true doctrine on the subject. *Ib.* And in the case of *The Duke of Somerset vs. Fogwell,* 5 *Barn. and Cres.* 875, an action was maintained by the plain-

tiff, without either the property of the soil or the water, for injury to his several fishery in the river *Dart,* where the tide flowed and reflowed.

It would therefore be competent for us to rely upon the long user and enjoyment by the appellee, and those whom he represents, as establishing a personal right in them, by usage and prescription, to haul the seine over the place where the rail road company are erecting their wharf.

3. But we contend further, that it is a right appurtenant to the fee simple estate of the appellee in the shore from which his seines are laid out. Within what period then may such a right accrue to a person by prescription?

There can be no doubt that the uninterrupted use and enjoyment of a right of fishery in a private river for the period of twenty years would establish title to a several fishery. It has been repeatedly adjudged that such user and enjoyment, in any particular manner, of the water of a stream not affected by the tides, afforded a conclusive presumption of right. *Balston vs. Bensted,* 1 *Camp. Rep.* 463, and *Taylor vs. Wilkinson,* 4 *Mason's Rep.* 404, and in the case of *Ingraham vs. Hutchinson,* 2 *Con. Rep.* 584, it was decided not to be necessary that such enjoyment should have been adverse to the claims of those affected by it. If we assume that the property in the soil and right of fishery, opposite *Coffield's* lot, were granted by the lease, then, according to the principle of the case of *Brown vs. Kennedy,* those rights were subject to the rules of law applicable to private property; and being so, the unexplained use, occupation and enjoyment by the lessor and the appellee, furnishes a conclusive presumption of right; consequently, no title derived under *Coffield* could avail the appellants.

4. But it will be urged that the river being navigable, the place in dispute belongs to the public, and as against them no right of several fishery could be acquired by the occupancy and user for twenty years.

In answer to that view we contend, that the facts of this case establish an unquestionable right both against *Coffield's*

assigns and the state. It is true that legal prescription is still reckoned in *England* from the reign of *Richard I.* notwithstanding the statute 32, *Henry VIII.* reducing the time within which a writ of right should be brought, 2 *Black. Com.* 31; but so sensible are the courts of the great inconvenience of the rule, that they in effect evade its requisitions by uniformly directing the jury to presume a grant, after the lapse of twenty years; which is the very basis of a prescriptive right; and differs from it merely in respect to the mode of pleading and the nature of the presumption.

These views are ably illustrated and enforced in the case of *Coolidge vs. Learned,* 8 *Pick. Rep.* 505, in which the supreme court of *Massachusetts* held, that sixty years were sufficient to create a good prescriptive right; and in *Melvin vs. Whiting,* 10 *Pick. Rep.* 295, they determined that forty years possession established by prescription a right in the plaintiff of several fishery in the *Merrimack river.* But there are other cases in which a much less period of time has been deemed sufficient to support a right by prescription. In the case of *Jacobson vs. Fountain,* 2 *John. Rep.* 170, an action of trespass, for going upon the plaintiff's shore and several fishery in tide water, was sustained by evidence of a usage for only eighteen years; and *Chief Justice Savage,* speaking of this case, in *Gold vs. James,* 6 *Cowen,* 376, says, " *Jacobson vs. Fountain* is an instance in which the plaintiff proved a prescriptive right to the fishery opposite his soil." And why shall not a party as well be permitted to prescribe for a right of several fishery, as for a right of way; or for a charter to a corporation, as in *Stockbridge vs. West Stockbridge,* 12 *Mass. Rep.* 400, where thirty years usage was ruled sufficient; or for a ferry, *Stark vs. McGowen,* 1 *Nott and McCord* 378, and 3 *Page's Ch. Rep.* 314. In these cases the prescriptive right is established against the public, as the presumption is of a grant of the franchise from the government; and *vide* 5 *Har. and John.* 122. But we think that twenty years should be held sufficient in this state, by analogy to the *act* of 1818, *ch.* 90; which, viewed as a relin-

quishment on the part of the state, of a right of entry upon land, after twenty years uninterrupted occupancy, that the same time should, in respect to an incorporeal right, be adopted as the period of legal prescription.

5. If however, the averments of a quiet and uninterrupted enjoyment of this appurtenance are not sufficient to establish a right by prescription, yet we insist, that the appellee is entitled by usage to the several fishery.

6. But should a user for twenty years, when uncontradicted, be deemed *per se* insufficient to vest in him a *prima facie* right, it would still be competent evidence to authorize the presumption of *anterior* usage in support of the right asserted. *Parsons vs. Bellamy, Cridland, et al, 4 Price's Ex. Rep.* 190.

7. It will probably be contended on the part of the appellant, that the fishery enjoyed by the appellee was the mere exercise of a common right, and therefore gave no several property in the fishing place; and this view will no doubt be presented on the authority of the case of *Chalker, et al vs. Dickinson, et al,* 1 *Con. Rep.* 382. There the plaintiffs had uninterruptedly exercised the right of fishery in a particular place in the *Connecticut river* for fifteen years, and the court held, that as the river was navigable and the right of fishing in it *prima facie* public, the uninterrupted enjoyment for fifteen years, not being exclusive, conferred no right of several fishery. This case decided two questions, *first* that an uninterrupted was not necessarily an exclusive enjoyment; *secondly,* that in order to gain an exclusive right, the possession must be exclusive as well as uninterrupted. But while this case determines against the acquisition of the right by an uninterrupted enjoyment, it expressly concedes it when the possession has been exclusive. So that it clearly supports the doctrine we have been contending for, that the right might be acquired against the public by analogy to the period required by the statutes of limitations. But the difference between that case and the present consists in this, that the plaintiffs there, gave no evidence shewing that the

possession was exclusive, but rested solely on the ground that an uninterrupted enjoyment imported an exclusive one. They did not even prove that they owned the adjacent banks or shore from which they hauled, but seem to have enjoyed the fishery by nets or seines drawn from boats moored in the stream as is common even in the *Susquehanna;* much less that they had bestowed great labour or expended large sums of money, in clearing the bed of their haul of logs, rocks, mud and other obstructions in order to establish their fishery; and had annually, for upwards of twenty years, incurred trouble, labour and expense, in the removal of obstructions that accumulated in their haul, by periodical freshets in the river, so as to preserve their fishery. But they submitted their cause without offering evidence of a single fact from which even an inference that their possession was exclusive, could be drawn. Is that this case? Do we rest on the statement that we had "held, possessed and enjoyed this fishery quietly, without any kind of interruption, and been accustomed to haul seines there for upwards of twenty years?" No, but we aver acts, the very nature of which, are utterly irreconcilable with any other tenure than that of an exclusive one. It cannot be presumed that, either the testator would have incurred such labour and expense in the establishment of this fishery, or the appellee have continued an annual expenditure for upwards of twenty years, for its preservation, if it had been common property, and the public, or any one without his permission, had a right to participate in its enjoyment. These circumstances show that the possession and enjoyment was sole and exclusive. We have therefore in the present case established what would have availed the plaintiffs in *Chalker vs. Dickinson,* so that it is a direct authority in support of the appellee's right of several fishery.

8. The right to lay out seines obliquely up the stream so as to fish the water in front of the shore above, is founded upon usage and custom. The bill expressly avers that owing to the rapidity of the current a seine cannot be laid out in

any other manner. The usage is general and prevails not only on the *Susquehanna river*, but at the fisheries on every stream where there is considerable current, and arose from necessity. The river is always so high during the fishing season as to render it utterly impracticable to lay out a seine opposite the fishing shore and land it at the same place in such a manner as to catch fish; the rapidity and power of the current would irresistibly sweep it down the stream, and cast it rolled up on the shore below. All sales and grants of lands bounding on the *Susquehanna* are made with reference to this usage, and never before, since a seine was first launched into the river, has this right been questioned. We submit, therefore, that under these circumstances, the lessee could not have intercepted the exercise of this right.

9. But the right of owners of fisheries on the *Susquehanna* to their respective hauls, is recognized and sanctioned by the act of 1807, *ch.* 114, and by a substitute for that act, passed in 1820, *ch.* 199. By this act the legislature evinced more than ordinary interest in the preservation of the invaluable and cheap source of sustenance which those extensive fisheries furnished; for they not only absolutely inhibit the enjoyment of the common right of fishery within the hauls of the shore fisheries, but even make the paramount right of general navigation, in some respects subordinate to their perfect security. Whatever therefore, may have been, antecedently to the enactments of this law, the tenure by which *riparian* proprietors who had established fisheries on the *Susquehanna*, held and enjoyed their respective hauls, this statute furnishes a distinct admission and affirmance on the part of the legislature, of their legal existence, and strong claims to protection. Will it then be determined, that those rights, which have been exercised for the public advantage under the sanction of legislative enactments for thirty years, have no legal foundation, and may be wrested from the citizen, without indemnity, by the pleasure or caprice of the appellants?

That an enlightened public policy vigilantly guards and

fosters those rights is shewn by the act of *Dec. Sess.* 1835, *ch.* 168, which, in granting to the owners of fee simple property, the right to wharf out into navigable rivers, annexes a proviso, that they shall not be " so extended as to interfere with the fishing or navigation of said waters." And the act, under which the rail road company are claiming to erect this wharf, manifests the same anxiety to preserve the shore fisheries, by withholding the power of condemnation of property for the site of a wharf; they must acquire it by purchase: *vide sec.* 4, *ch.* 281, act of 1834.

MAYER, in reply, for the appellants.

Upon the absence of answer of the directors, with the answer of the corporation. That answer is called for only on the principle of discovery, with reference to the points relied on, it could have no effect. It might be useful in the further progress of the cause, but here, not necessary. The bill as against the agents of the corporation is merely for discovery, it can neither give nor withhold relief to the corporation. If the answer of directors was on file, the company, looking to the principles and origin of the practice requiring such answers, could not use it for their relief. In opposition to the corporate answer, of no effect.

If the answer of a corporation has not the effect of an answer on oath, as to injunctions, how could they procure a dissolution ? Proof which could not avail, is not to be demanded. The legislature might apply a remedy.

The case in 5 *Peters*, simply decides, that the answer as evidence at the final hearing shall not have the effect to require two witnesses to contradict it. In *England*, in ordinary cases the bill and answer are before the chancellor, prior to issuing the injunction.

There is however, more here than a mere answer. The petition of the complainant by the oath of the president refers to the answer and verifies it. The oath of the engineer shows the necessity of the wharf as constructed by the company. It was filed with the answer, and denies the equity

of the bill. The defect of the bill as to officers, is that they are not connected with the discoveries sought.

But independent of this question, there is sufficient reason on the face of the bill, against the injunction, which arises from the merits. A wharf is complained of. The intention of the company is immaterial. The effect of the wharf is matter of inducement. What does the bill charge? That the owner of the land for twenty years, had certain fisheries ; that the wharf will injure the fishery and navigation. The bill insinuates that the wharf is longer than the company can desire, if they have any authority to erect it, and assigns as a reason for it, that there is an easy and safe approach for a ferry boat to the shore. This is the whole rationale of the complainant's conclusions. The bill is argumentative as to this point, and is destitute of the necessary averments to present a case of improper extension of the wharf into the river.

What is the object of the bill? There is no usurpation of the soil, on which the wharf is erected. The right of the state to create the rail road company is not denied. But he complains of an incidental injury, for which his bill can call for no specific relief but by injunction ; as to an injury to the fishery, the law could give him full redress.

Then as to an injury to navigation. As to this no information lies by the attorney-general. The only remedy is by indictment. The grand jury cannot be superseded by other process. It is criminal in its character. A matter of public nuisance, no individual, except for injury sustained, could be redressed at common law. No invasion of complainant's freehold. The wharf is to subserve a public object, and the company is to subserve the accomplishment of a public end. They would be amenable as common carriers, if they capriciously refused to accommodate the public.

Looking to the injunction as merely an intermediate step, the court will not sustain it, as the bill looks to no ulterior measures, but assumes that chancery would give full relief,

which is palpably wrong. If the charter is not void, the bill must be dismissed.

The *termini* of the road being fixed, the company are to adopt all intermediate acts, though not expressly authorized, and for injury to these, the redress is at common law. So is the case of the circuit court of *Pennsylvania* cited in the argument.

Has any right been invaded? Doctrines are assumed here, which go far to divide the sovereignty of the state with the *riparian* proprietors of the river, because the exercise of sovereign right may interfere with the private proprietor. The right of several fishery, of free fishery, depending on prescription, is made to ride over all public powers, exercised against its interest. They must catch their fish, no matter who is affected. The paramount right of navigation is denied by them. The right of fishing for trade or subsistence is not a right of property.

The waters of public rivers belong to the state. The right of fishing is not an interest in the waters. It is a privilege to catch where you may. The prescription does not alter the character of the right. It merely excludes other *persons,* but the state has not parted with the soil. Let them go on with accretions of power, the lords of the *Susquehanna* would take the whole power of the state on the doctrines of a several fishery. The grossness of these results shows the absurdity of the doctrine. Upon his next bill complainant will include one-half of the river, because for twenty years he has had the right to fish. Several or common, it is but a fishing in a navigable river, which is a common right. The lapse of time does not change the character of the right, as regards the rights of the state, both classes are in like condition. Even in private streams the right of navigation exists separate from that of fishery. *Ex parte Jennings,* 6 *Cowen,* 528. *Hooker vs. Cummings,* 20 *John.* 90. The *riparian* owner cannot disturb navigation. But this is a public river, whose waters are under the public care for public purposes. In *England,* the king

cannot appropriate public streams to the interference of navigation, but the *riparian* proprietors may build wharves to benefit it. In 5 *Har. and John.* 195, all the judges concur with regard to public streams, and the state has no right to grant a monopoly of fishing on a public stream.

The cases cited in argument were of prescriptions between individuals, now set up as against the public. There is no authority to warrant that. Prescription does not apply to the state.

The right of navigation is more than the right of passing on a public river. *Angell on Tide Water,* 132.

SPENCE, Judge, delivered the opinion of the court.

The complainant in his bill charges, that heretofore *John Stump,* the father of this complainant, being seized in fee under grant by patent from the state of *Maryland,* of a tract of land called *Perry Point,* situate in *Cecil* county, at the mouth of the *Susquehanna river,* established upwards of twenty years since certain fisheries on said property, and at which by means of seines hauled over certain portions of said river, large quantities of shad and herring were annually taken.

That afterwards the said *John Stump* departed this life, having by his last will and testament executed in form and manner, sufficient to pass real estate, devised said estate, with all and singular its rights and advantages of fishery to your orator, under which said devise he entered, &c.

That on the second day of March, 1811, the said *John Stump* leased and demised to one *Martha Coffield,* of *Cecil* county, for the term of ninety-nine years, with covenants for the renewal thereof, eight acres of said estate, binding on the said public road, leading from the *Susquehanna river* to *Chestertown,* and along said river, &c.

The bill also charges the river *Susquehanna* to be a public navigable river, and that the erecting this wharf, and the employment of steamboats, will be destructive of the para-

mount interest of general navigation and fishing, and that any obstruction of those rights would be void.

In this cause it is the object of the complainant to establish his right to a several fishery, and he alleges, that the uninterrupted use and enjoyment of the same for more than twenty years, is sufficient in law to raise the presumption of a grant of a several fishery.   There is not to be found in the bill any allegation of an exclusive possession and use of this fishery, by the complainant, and those under whom he claims, nor is it averred, that others did not use and enjoy this right of fishing in the *locus in quo*, in common with this complainant. The bill charges this to be a public navigable river, where this several fishery is attempted to be established by presumption, and upon these allegations this court is called upon to decide, that a grant is to be presumed of an exclusive fishery.

We know of no principle of law, and we have seen no adjudicated case, which sanctions such a conclusion.   That a presumption can be raised of a grant of a several fishery in a public navigable river, from the fact of an individual using the same in common with others, is at this day a strange doctrine :  and the bill in this case does not allege, that the complainant, and those under whom he claims, had an exclusive possession :  and it is the uniform language of the courts, that they will not presume a grant of land under navigable waters, to the owners of the adjacent soil, without evidence of long exclusive possession and use, to warrant such presumption.  *Palmer vs. Hicks*, 6 *John. Rep.* 133.   If it be law, that a court will not presume a grant of a several fishery in a public navigable river, without proof of long exclusive possession and use, it follows as an irresistible conclusion, that the omission to make such averment is fatal to this bill.

The allegation in the bill, that the erecting the wharf, and the employment of steamboats, will be destructive of the paramount interests of general navigation and fishing ; and any grant destructive of those rights, though void, furnishes no ground for injunction ; but it, the remedy by injunction, is applicable only to special injuries, in violation of private

right; and individuals are not authorized to redress public grievances at their own suit, either at law or in equity.

In the above decision we do not desire to be considered as expressing the opinion, that if there had been an averment of an exclusive fishery from long adverse enjoyment, that by the laws of this state, a legislative grant might or might not be presumed; but leave that question open for future decision when it shall arise.

INJUNCTION DISSOLVED.